Okay, the last case of the morning is number 24-50852 Vasquez v. Union Pacific Railroad. All right, Ms. Opperman, when you're ready. Good morning. May it please the Court. Caitlin Opperman for Appellant Rolando Vasquez. We are asking this Court to reverse the District Court's summary judgment decision in favor of Union Pacific and against Mr. Vasquez and to remand the case for further proceedings. I'd like to focus my time this morning on the issue of direct threat. The central question in this case is whether Union Pacific was justified in removing Mr. Vasquez from work and placing work restrictions on him that prevented him from returning to work for five years, based on its determination that he posed a direct threat. The District Court concluded that Union Pacific was entitled to summary judgment on this issue. That conclusion was an error because there are genuine disputes of material fact with respect to Union Pacific's direct threat defense. This Court has said that determining whether an employee poses a direct threat is a fact-intensive inquiry. Rarely is summary judgment appropriate on a direct threat defense. Rarely is it a question of law. To satisfy the requirements of the individualized assessment, that assessment is of the employee's present ability to safely perform the essential functions of the job. The assessment must be objectively reasonable. What that means is that it must rely on the best available evidence. The ADA's regulations, which this Court has cited on various occasions, including in the first Rizzo case, lay out four additional factors for consideration. The duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur, and the imminence of the potential harm. Let me ask you a question first. Supposedly, there's a conflict in our authorities about how the direct threat factor is used, whether it's part of the plaintiff's case or part of the defendant's case. Does your case depend on our resolving that? It does not, Your Honor. Okay. While we certainly believe that the burden of proof rests with Union Pacific on its direct threat defense, as it would with any other affirmative defense, it is not outcome-determinative here. And that's because there are genuine disputes of material fact with respect to each element of the analysis. Whether Union Pacific's determination was objectively reasonable, whether it conducted an individualized assessment, whether it relied on the best available objective evidence, so regardless of which party bears the burden, those genuine disputes of material fact will carry the day. I'd like to highlight for the Court some of the evidence that creates genuine disputes of material fact in this case, beginning with evidence that Union Pacific did not conduct an individualized assessment. Union Pacific's fitness-for-duty process is designed to be standardized, not individualized. Union Pacific follows a template for its fitness-for-duty determinations. For that, I'd refer the Court to ROA.2183. As you'll see in that template, Union Pacific imposes pre-established work restrictions based on a formulaic approach that pairs the category of an employee's injury with the department-at-large of the employee. That approach does not consider a particular employee's medical prognosis, nor does it consider the specific job duties performed by that particular employee. Well, what was the point of having four doctors look at the fellow's medical records? You're right. So Union Pacific has an extended process whereby sometimes multiple doctors or consulting doctors review the record. What's important is not the number of doctors. It's whether that determination was objectively reasonable. And there are several reasons why it was not in this case. Every single one of Union Pacific's doctors who reviewed Mr. Vasquez's case relied on the Federal Motor Carrier Safety Administration Handbook. That's a handbook that was created for the commercial driving industry. It is not applicable to railroad workers. Critically, that handbook was removed from use in 2015. In fact, quite literally on every single page of the handbook, it is watermarked, do not use. But again, you have doctors, don't you, deciding whether to use a handbook that talks about, you know, occupational health, right? Right. They have decided to use that handbook, but their subjective assessment that that handbook is reasonable to rely on does not equate to objective reasonableness. What the law requires in a direct threat case is whether it's objectively reasonable. Here the evidence that that handbook was withdrawn from use, that it was no longer good medical evidence to rely on, coupled with the fact that Mr. Vasquez's doctors, none of whom, and I would say that he had multiple treating providers, none of whom opined that he posed any sort of safety risk or risk of sudden incapacitation. Is he still working for the other railroad? He is not. In fact, he is back at Union Pacific currently. His restrictions have expired. Oh. Well, I noticed, I saw five years had passed. Yes, Your Honor. So what are you, what's the claim here? Right. So even though Mr. Vasquez is back at Union Pacific, the five years that he was out of work still constitute an adverse event. I think that's clear under the law of this Court and Supreme Court case law, that an unpaid leave from work for that period of time, if it was not justified. So he's going to get some kind of damages? Correct. He'd be looking for back pay and emotional distress damages. I see. Hmm. Counsel, wasn't, weren't Mr. Vasquez's arguments essentially rejected in Carrillo versus Union Pacific Railroad Company? There are several distinguishing facts between this case and Carrillo. The first important distinguishing fact is that no treating provider in Carrillo could say whether or not Mr. Carrillo had had a seizure. Here, the record is unequivocally clear that Mr. Vasquez has never had a seizure. The second distinguishing feature is that Mr. Carrillo did not receive any form of work release from his treating medical providers. Here, Mr. Vasquez did in fact receive a return to work clearance that cleared him to return to work as of July 29th of 2019. The third distinguishing feature is that the expert in Mr. Carrillo's case in fact conceded that Union Pacific's determination was not unreasonable. Here, our expert evidence unequivocally states that there was no reason that Mr. Vasquez should not have been returned to work. So there are significant factual points that make this case different from that. But it still rejected the argument that Union Pacific intentionally disregarded the best objective evidence. In other words, it was using the same standards that you're attacking here today, and we said it's fine. You're correct. That case, which is an unpublished case, did say that. But our case doesn't hinge on the FMCSA handbook alone. That evidence, coupled with the fact that none of Mr. Vasquez's treating providers ever deemed that he posed a safety risk, there was no evidence that he posed a safety risk at the time the fitness determination was made. We're talking about a future risk here. There is other evidence in the record beside the handbook to determine that there is a genuine dispute of material fact. Picking up on that point, with respect to Mr. Vasquez's medical providers, our position is that the best available objective evidence comes from those medical providers. Those providers include hospital neurologists, the nurse practitioner who signed Mr. Vasquez's return to work clearance, the neurologist who performed an EEG and MRI of Mr. Vasquez nearly eight months after the accident, and a neuropsychologist who evaluated Mr. Vasquez. None of those providers identified him as being at risk for sudden incapacitation. It's very clear that he never had a seizure. The EEG showed that there was no seizure activity. His evaluation of Mr. Vasquez, plaintiff's expert Dr. Trangle, concluded that he was capable of returning to work, and not only that, that his risk of seizure at that time was not increased beyond what we would expect in the general population. Did any of his treatment providers make this assessment in the context of comparing or looking at what his job duties were? Several of his providers knew that he worked on the railroad with railroad signals. I think the note from the nurse practitioner, Wilson, who signed the return to work clearance, says that Mr. Vasquez was a railroad signal worker, that no light duty was available on his job. Similar notations are made in Dr. Wu's records. She was the neurologist who conducted the EEG and MRI study. I would also say that it's not, their focus is not about duties, right? Regardless of what his duties are, the question is whether or not he is safe. Does he pose a seizure risk or not? They are in the best position, after physically examining him, doing these evaluations, to make that assessment of whether there is a seizure risk. Well, wouldn't it be helpful to them in making this determination to know what kind of duties he had and the significance of any potential for seizure or any other medical event? It may be helpful, Your Honor, but it's not dispositive. The question is not, the question is whether he can perform his job safely, regardless of his duties. Here, Union Pacific's concern is talking about a future risk of sudden incapacitation. Union Pacific's concern isn't keyed to a particular job duty. Union Pacific isn't saying, well, Mr. Vasquez can't safely inspect railroad signals because he has a future risk of sudden incapacitation. They haven't keyed those two things together. Isn't he just essentially disputing the outcome here? He thinks it's more about the outcome as opposed to the process, and didn't Carrillo say that the direct threat defense protects the employer even if the employer does not reach the correct diagnosis? You're correct that the employer doesn't have to reach the correct outcome, but what the law requires is that the employer was objectively reasonable in that assessment, and the fact that they're relying on defunct, outdated medical evidence, discrediting or disregarding current credible medical evidence from people who actually examined Mr. Vasquez, that is enough to say that there is a dispute of fact about whether their assessment was objectively reasonable under the law. The other piece of the direct threat analysis that I haven't touched on is the accommodations piece. So if an individual is deemed to pose a direct threat, an employer must also determine whether a reasonable accommodation would either eliminate the risk or reduce it to an acceptable level. Again, there are genuine disputes of material fact on this issue. Union Pacific's accommodations process is to have its managers complete a restriction review form indicating whether the employee can be accommodated and in what respect. Here, Union Pacific failed to follow that process. The review form in the record is blank and was never filled out, and his managers testified that they don't recall ever having conversations with Union Pacific's health and medical services about whether Mr. Vasquez could be accommodated. There's also significant evidence that Mr. Vasquez could indeed have been accommodated. Even within his electronic technician inspector role, testimony from his manager Mario Acala indicates that he could have done so with modifications. For example, driving his own vehicle rather than a company vehicle to job sites. If he had driven his own vehicle to job sites to do his job, how would that be different in terms of liability for the company from driving a company car? I imagine there would probably be a difference in liability. That's not something that has been addressed in the record. I thought one of his supervisors unequivocally said he could not perform his particular job anymore. You may be referring to the signal construction position.  Okay. I can address that as well. There were three alternative positions that Mr. Vasquez specifically requested to be considered for. Those positions were a clerk position, which was his best job, a manager of signal maintenance position, which was in fact a position that he had held previously, and then a position on a signal construction gang. The signal construction gang is generally a gang of approximately five people. The testimony in the record is unequivocal that you don't need to be able to drive to be part of that gang, if there are at least other people on that crew who are able to drive. I think what the director testified to that Your Honor is referring to is that they would have been unable to accommodate all of those restrictions for an extended period of time, and in fact there's evidence in the record that they have accommodated driving restrictions for people for much longer for other reasons. But he didn't just have a driving restriction. He had four other restrictions as well, correct? Yep. So beyond the driving restriction, some of those restrictions simply aren't applicable. So for example, the restriction not to operate cranes, machinery, or hoists, that is not equipment that Mr. Vasquez operated in his electronic technician inspector job, nor would he have had to operate it on the signal construction gang. There is a restriction about not working on or near moving trains unless protected, and in fact Union Pacific's chief medical officer testified that that restriction is essentially superfluous because as part of their standard operating safety procedures, there is no employee who is working unprotected, near, or on moving trains. And so those other restrictions didn't preclude Mr. Vasquez from taking an alternative role. Well, wasn't there testimony in the record that even for the manager position, driving was a requirement? Driving a company, driving was a requirement, but the restriction is driving a company vehicle. It's a fine distinction, but I think it's an important one. And was inquiring about a clerk position sufficient? In other words, doesn't Mr. Vasquez have to show that he could perform the job? He is, and I believe there's testimony in the record from Pauline Weatherford, who is the vocational rehabilitation counselor, admitting he was in fact qualified for that position. The record shows there was an actual available position, and then the record trails off. Mrs. Weatherford never followed up with Mr. Vasquez about that position after he inquired specifically about it. Can you address the argument in the response brief that at some point Mr. Vasquez said I found another job, we don't need to talk about this anymore? That was after multiple attempts at trying to obtain an alternative job within Union Pacific. At some point I think it's reasonable for him being out of work to attempt to obtain a job elsewhere, getting nowhere with Union Pacific. Thank you. All right. Thank you very much. Ms. De Leon. Thank you, Your Honors. May it please the Court. Laura De Leon on behalf of the police at Union Pacific Railroad. Counsel seems to have abandoned their issue regarding challenging the lower court's decision on grounds of direct evidence. So since counsel has now focused their argument on direct threat, I will address that in turn. The record here shows that Union Pacific did what it was supposed to do unequivocally without any genuine issue of material fact. Union Pacific engaged in a very detailed and lengthy individualized assessment of Mr. Vasquez's conditions and limitations based on his severe injuries that he experienced when he got into his motorcycle helmet while under the influence without wearing a helmet. Union Pacific conducted this assessment by relying on his own medical records from his multiple treating physicians, and Judge Ramirez, Justice Ramirez, you pointed out that none of those medical providers released him to return to work in the context of having reviewed his actual job duties and requirements at Union Pacific. They didn't know what he was required to do as part of his job, nor did they have any concept of the inherently safety-sensitive position that he was employed in as an ETI. So part of this individualized assessment, they had four different doctors review Mr. Vasquez's medical records, one of whom was an actual neurologist. They looked at his medical records, and Union Pacific did not categorically issue any restrictions, but did in fact consider his individual medical condition, and that is at ROA 3695. With respect to the four different factors, too, that the courts need to evaluate with respect to direct threat, there is specific record evidence that is undisputed that supports the finding that Mr. Vasquez, with his current situation, would have posed a direct threat either to himself or to others at the railroad. As to the duration of the risk, Dr. DeSing consulted the FMCS, I always get that acronym mixed up, I'm sorry, the Federal Motor Carrier Safety Guidelines, those handbooks, which counsel or my friend had indicated were withdrawn. Now, this issue has come up in so many other cases, and in particular, the court had acknowledged the Carrillo decision, which involved very similar situation as this, where Union Pacific had removed an employee from service, the district court granted summary judgment to Union Pacific on that case, and the Fifth Circuit last year upheld that decision. Yes, it is an unpublished decision, but it can still be used, it's not precedential, but it can still be persuasive, and that argument is spot on and directly applicable to this case, notwithstanding a couple of minor different fact issues that existed. The process that Union Pacific followed and the findings of fact and law are equally applicable to this particular case. Going on to that, the Carrillo case did acknowledge the reasonableness in relying on the Federal Motor Carrier Safety Guidelines, as Union Pacific continued to do. Notwithstanding that they were taken down from the website, they remain the only type of safety guidelines that exist for federal transportation workers. They have not been debunked, they have not been discredited, they have been removed, and as our evidence indicated in the declaration or affidavit from Union Pacific's medical officer, he relies on them, finds them very effective, he uses them as guidelines. And that is the only objectively reasonable standard that's out there. There is no better federally issued guideline for the safety of transportation workers when it comes to these issues. So it is objectively reasonable for the Union Pacific doctors to rely on these standards. And that is a fact that the Carrillo court actually acknowledged as well, as well as the court below. In evaluating these factors, the Union Pacific assessed the duration of the risk, took into consideration whether there should be a two-year limitation or five-year limitation, looked at the individualized inquiry of Mr. Vazquez's records, identified the location of his subdural hematoma, and made the assessment that a five-year restriction made sense under these circumstances. As for the nature and severity of the potential harm, unlike Mr. Vazquez's doctors, Union Pacific doctors looked at the safety-sensitive and safety-critical nature of Mr. Vazquez's position, including the fact that he worked with high-voltage equipment, often by himself, driving company vehicles, and discerned the risk of serious incapacity. And that all is in the record as well, 3692 to 3693, as well as 2297 to 2298, and 2313. My friend had pointed out, or at least attempted to indicate, that the fitness for duty form, that the fitness for duty letter that Dr. Gillis ultimately presented to Mr. Vazquez that placed him out of service for five years contained restrictions that were not applicable to his job. That is not true, and you can see the actual fitness for duty letter, which is ROA 2730, and even compare it, basically, to his job description, which is also in the record, and that is ROA 2436 to 2438. If the court is inclined to do a line-by-line comparison, there are many examples in his job description that apply to the requirement to assure his safety of himself and others, as well engage in other tasks which align with the restrictions in that fitness for duty note. What we have here is Mr. Vazquez is not pleased with the results of the fitness for duty evaluation, and understandably, are, you know, have presented alternative viewpoints as to what Union Pacific could have done or should have done with respect to this analysis. However, as noticed by, again, the Carrillo Court and other courts which we do cite in our briefing, this process was followed appropriately with an individual objective analysis based on the demands of the specific job at hand. If I may turn next to the reasonable accommodation issue, which was Mr. Vazquez's fourth claim or fourth point or issue on appeal, was that our position is that the district court correctly granted summary judgment on the reasonable accommodation claim. The issue that is glaring here that my friend did not address is that Mr. Vazquez is not claiming he had a disability. He is claiming Union Pacific regarded him as disabled. Fifth Circuit case law, as well as case law within the circuit, says you cannot have a reasonable accommodation case when you're relying on a regarded as disabled theory. The premise is very simple. An employer is obligated to provide a reasonable accommodation to an employee who currently is unable to perform the essential functions of their job. If an employee is not disabled, what accommodation needs to be given? And again, in the Fifth Circuit, it is clear that there is no relief for a failure to accommodate when you are relying on a regarded as disability theory, as Mr. Vazquez is. And that is, I'm trying to find the case law now, but that is cited in our brief as well. But let's just assume, for the sake of argument, as to address these points, Union Pacific, there is undisputed evidence that it did engage in a reasonable and interactive process with Mr. Vazquez, starting with the very fitness for duty note that Dr. Gillis issued to him, where it said, we will follow up with you to find, to see if there are other jobs that you might be able to do. And as the justices aptly pointed out, there is evidence in the record that he could not do his current job, and that there were three other jobs, not that he identified as available or even specifically inquired to, but the evidence shows that he was just generally thinking about those jobs. So it's not as clear as... What's he supposed to do, file an employment application? I'm sorry? I say, what is his burden? Did he have to file an employment application? He identified other jobs available, allegedly, in San Antonio. But if they weren't, there is no... I don't believe there is evidence that indicates that they were available, and just because... Well, how is he, as the employee, supposed to know that? Through the discussions with Ms. Weatherford, and he also has access to available jobs on the job board. He would still have access to Union Pacific information, and would very easily be able to see, especially a union job, what jobs were available, and where he would stand with seniority on that, if that was a job he was qualified for. Isn't the employer required to offer an accommodation? It's an interactive process, where both sides have a role to play in that process. When there are other jobs, when we're talking about a situation like this, where he clearly cannot be accommodated in his job, and the employer and the employee need to consider other jobs, it is that interactive process. The employee would have just as much of a responsibility to engage in that as the employer does. They're supposed to work together and do a give and take. And that is what Ms. Weatherford did attempt to have conversations with him about those jobs. Rewind just a bit on the failure to accommodate, to make sure I understand, you made the dichotomy between having a disability versus being regarded as disabled, and I didn't recall that was the basis upon which the district court ruled, I thought it was, it's the assertion that the employee was disabled, but otherwise didn't satisfy the requisite, so I'm a little bit confused. The regarded as aspect, when you posed it, as the distinction here, I just didn't remember that the regarded as, as you said, was the defining factor in why the failure to accommodate. I thought it was because of the situation, his inability to drive, etc., etc., and all that. So what am I missing? Was that the rationale? You? I might have inadvertently confused the issue that the district court's ruling did do an analysis of the interactive process and whether there were jobs available that he could do, and the district court discounted that those jobs were, that he was qualified for those jobs, but he did find that Union Pacific did not fail to reasonably accommodate him or The issue with the regarded as that I pointed out comes before that, that it shouldn't, and this is what we argued in our mission for summary judgment, and it is in the briefing where Mr. Vasquez clearly states he's not disabled, he's proceeding under the regarded as in record of PRONG. So this would be an alternative argument. Issue one is you cannot have a regarded as claim, sorry, there's no claim under the ADA for a failure to accommodate based on regarded as, and I found the case site, that's the Stewart case out of the Northern District of Texas, and then we also cite the Amity v. Shell case, which is a Fifth Circuit 2020 case. Similar logic applies to a record of, but you're correct, Your Honor, that the opinion below did go into that reasonable accommodation analysis. Can you respond to the argument that the form that showed this engagement was blank, that there was a specific clerk position that was available at the time, and that Mr. Vasquez presented evidence of this in the summary judgment proceedings below? Well, with respect to the form, respectfully, that would be looking at form over substance. Whether a form was completed or not sort of pales in comparison to analyzing what the individuals actually did. So you're not disputing that the form was blank? The form appears to be blank. Okay. All right. But still there is ample evidence that through Ms. Weatherford and discussions that she had with others, there was an evaluation analysis about what could he do? What could we do? Were there other positions available? Was there a means to accommodate him? As for the clerk position, the evidence there, I'm trying to refresh my recollection on what that says. He says, and as the court noted, he testified, Mr. Vasquez testified that when he pursued these options, he was not talking about particular positions, but just generally talking about different types of jobs that he thought that he could do given his work history with the company. As the court noted, he actually bears the burden of proving that an available position existed and that he was qualified for, and the court indicated that he made no showing on that issue. And that is the Moss case that the court cited there. Where in the timeline does his statement that he'd already found another job happen in relation to what's happening behind the scenes with Ms. Weatherford? That is a great question. It happened, I do not know the answer to that off the top of my head. It did happen at a, it appears that it happened, he broke off discussions with the company after he said he had another job with another company and that an internal placement was unlikely to be needed. I do have the site from the MSJ, but I don't have an ROA site for that. But that certainly would be a clear indication at that point, whatever the motivation is that he then removed himself from the interactive process. So anything further would not be necessary at that point. So in short then, the district court did not err when it granted a summary judgment in Union Pacific's favor. Even though there was, with respect to the direct threat issue, as indicated, putting aside the issue of who bears that burden and where does it come in, Union Pacific met its burden, even assuming that it did have the burden as an affirmative defense to prove that Mr., it believed that Mr. Vasquez's situation created a direct threat. But it did perform an individualized inquiry and a very thorough and individualized inquiry at that. There was similarly no further evidence, though, that the district court found that indicated there is any discriminatory animus exhibited by Union Pacific throughout this whole entire process. It discounted any reliance on the fitness for duty letter itself as direct evidence. It then proceeded to evaluate under circumstantial evidence, and it found that there was no discriminatory animus or discrimination that occurred. And finally, the court did, in fact, even though it did analyze the reasonable accommodation claim, there was no undisputed material fact there that would warrant reversal of the district court's order. Thank you. All right. Thanks very much. Ms. Opperman-Rebuttal. Thank you. I'd like to address several points made by counsel. First, with respect to whether we have abandoned the issue of direct evidence, we certainly have not. I just focused my time this morning on direct threat, but certainly we believe this is a direct evidence case. Similar to RZA 1, there is no question about why Mr. Vasquez was removed from work. In a McDonnell Douglas pretext case, there is a search for causation. Here, the question is not causation. The question is justification. Just succinctly, as you know, it's rare when you see in any context direct evidence asserted. I mean, normally in all these cases, it's circumstantial. So just in one sentence, say what the direct evidence is. In the fitness for duty determination letter, it says, based upon Vasquez's traumatic brain injury and subarachnoid hemorrhage location, he was at an increased risk for sudden incapacitation from seizures and required certain work restrictions. It neatly ties the disability and the adverse action together. There's no question about the cause for restrictions. With respect to the sufficiency of Mr. Vasquez's return to work clearance, that's a question for the jury. Moving along, I think counsel addressed the FMCSA briefly. Whether it is objectively reasonable to rely on the FMCSA is also a question of fact. That's particularly true where we have conflicting evidence that Mr. Vasquez did not have a risk of sudden incapacitation. Union Pacific's decision to continue to rely on that handbook is a subjective assessment. It's not the assessment that the court is making here, which is an objective one. I'll also note that there is a federal registry entry at the time of the handbook's removal that explains it's being removed because the information therein is obsolete and prescriptive. So it has, in fact, been deemed to be defunct guidance. I think counsel also addressed the job description a bit. Dr. Charbonneau, who is one of Union Pacific's medical officers, admitted that not all parts of the job description are applicable to the ETI position in his deposition. In fact, the managers of Mr. Vasquez testified that he did not operate cranes, that he did not work at heights without protection, that he did not work on or near moving trains without protection. So to say that the restrictions imposed on him were all specifically applicable to his job duties is disingenuous given the record. Counsel talked about the failure to accommodate claim. I agree with counsel that the law says if you're proceeding solely on a regarded-as theory, you cannot pursue a failure-to-accommodate claim. Here we're proceeding both on a record-of-disability theory as well as a regarded-as theory. So to the extent Mr. Vasquez has a record of disability, the failure-to-accommodate claim is viable. So to Judge Carrillo's, Ramirez's question, at what point did Mr. Vasquez break off accommodation talks? I looked back at the record, Your Honor. It's in the medical comments history. ROA.1747 is where it says that Mr. Vasquez informed Union Pacific that he had found another job. That was after having the conversation with the chief medical officer and the director about the signal construction position, and I believe that was also after the e-mails he exchanged with Pauline Weatherford specifically about the clerk position and the manager of signal maintenance position, both of which I believe were posted actual positions. And that information is in the record as well. Those were exhibits to summary judgment. What about the contention that he stated he was talking about jobs generally and not specific job postings? He did testify to that in his deposition later on in this case, but the actual contemporaneous record evidence shows that he made specific requests for specific positions that were available within Union Pacific and communicated that to Pauline Weatherford in vocational rehabilitation services. So he told her, I see that there's a clerk position open. I think I'm qualified to do that? Yes, and similar with the manager. I believe he noticed a manager position available within San Antonio and specifically inquired about that position. All right. Now, was there a finding? I believe I saw a deposition testimony that even the manager, and we talked about it earlier, that even the manager position required some driving. I believe so, that it would have required him to drive a vehicle. Whether or not that's a company vehicle may be a question of fact. Finally, I want to address counsel's comment that this case is about whether or not Mr. Vasquez is pleased or that Mr. Vasquez is indeed not pleased with the outcome in this case. The inquiry for the court is about whether Union Pacific made an objectively reasonable determination in its fitness for duty assessment. Respectfully, that is a question for the jury based on all of the disputes of material fact that we've identified in our briefing. With that, I'll conclude. Thank you. All right. Thank you very much. We appreciate it. As I said, we have three interesting cases. But now we will be adjourned.